IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 20, 2005 Session

**JAMES ROBERT (BO) HOBBS**

v.

**NORA ESTELLE HOBBS, TERESA WINDLE, AND DON HOLLAND**

An Appeal from the Chancery Court for Dyer County
No. 03C125     J. Steven Stafford, Chancellor

---

No. W2004-01553-COA-R3-CV - Filed June 29, 2005

---

This case involves the conversion of personal property. For several years, the plaintiff son stored various types of equipment in a pole barn located on his mother's property. The mother decided to sell her property and, in preparation for the sale, she hired the defendant scrap dealer to clear out the pole barn and sell its contents. The scrap dealer cleared out the pole barn and sold the son's equipment for a total of $657. After the son learned of this, he sued his mother and the scrap dealer, claiming that they converted his property and asserting that the property was worth $22,000 if purchased new. After a trial, the trial court held that the mother and the scrap dealer had converted the son's equipment, but awarded him $657 in damages, the salvage value of the property. The plaintiff now appeals. We affirm, finding that the son failed to submit proof of the actual value of the property at the time of the conversion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Sam J. Watridge, Humboldt, Tennessee, for the appellant, James Robert (Bo) Hobbs.

Marianna Williams, Dyersburg, Tennessee, for the appellees, Nora E. Hobbs and Don Holland.

**OPINION**

This case involves some troubled family relationships. Plaintiff/Appellant James Robert (Bo) Hobbs ("Son") was in the business of buying and selling used property and equipment from businesses that had closed. He bought items such as cotton gins, oil mills, and the like. Over the years, Son stored some of the items he had purchased in a "pole barn" located on land owned by his mother, Defendant/Appellee Nora E. Hobbs ("Mother"). The pole barn, built by Son and his father, is an open barn, 54 feet wide and 70 feet long, with a tin roof held up by poles but with no sides.

Mother decided to sell her land. In anticipation of the sale, in August 2002, Mother hired Defendant/Appellee Donald Holland ("Holland") to clean out the pole barn and haul away all of the items in the barn, including items owned by Son, and to sell them for scrap. Some of the items in the pole barn that were owned by Son had been there for as long as seven years. Pursuant to Mother's instructions, Holland sold Son's personal property, and from the sale of the property he collected a total of $657.05.

Son later learned of the sale of his property and was not happy. On March 17, 2003, Son filed a petition for conversion against Holland, Mother, and his sister, Teresa Windle ("Sister"). The complaint alleged that Holland, with the permission of Mother and Sister, took Son's property that was worth over $20,000. Son demanded $50,000 in damages for the defendants' conduct.

On April 19, 2004, the trial court conducted a bench trial in the matter. The trial court heard testimony from all of the parties, as well as other members of the extended family.

At the outset, Holland, the scrap dealer, testified. Holland said that Mother asked him to clear out her pole barn and sell its contents, and told him that in return she would give him fifty percent of what he collected. Over a period of two or three weeks, Holland said, he hauled the items away on his trailer and sold them to Hutcherson Scrap Iron. Holland said that he took the checks he received to Sister at the grocery store where she worked to have them cashed. Sister kept Mother's half of the proceeds to give it to her, and Holland kept his half. Though Holland cannot read or write, he identified his signature on the $657.05 in receipts he obtained from the sale of the property in question. Holland maintained that no one ever told him that the property he sold belonged to Son, and he assumed it was owned by Mother. Holland described the items he hauled from the pole barn as "scrap iron," and said that "[i]t wasn't worth nothing but junk." He said there were metal crates containing bearings, sprockets, and the like, all of which had rusted and had been subject to weathering and animals such as mice. Holland was aware that Son claimed that he had stored electric motors in the barn, and Holland described the motors he took as "junk." He said that dogs and rats had been kicking dirt on the motors, and that they were "marred up in the ground, and I got a winch on the back of my trailer, and I drug the thing up on the back of the trailer." Other pieces of iron on a welding table outside the barn required Holland to get a chain saw and cut down trees that had grown around the table and iron pieces in order to take them away.

Mother also testified. She described what was in the pole barn as scrap iron, and said that much of it had been put there by Son "off and on ever since the pole barn had been put there." Mother said that she knew that Holland "hauled junk," and she asked him to clean out the pole barn because she was preparing to sell her property.[1] Mother acknowledged that she did not tell Holland that the property belonged to Son, but said that she indicated to Holland that Son had "put some stuff in there [the pole barn]."

---

[1]Apparently the ownership of the property had been disputed within the family, and the trial judge had recently ruled that it was owned by Mother.

Sister testified as well. Sister said that she and her mother had a "bad" relationship with Son. Sister said that Holland would bring her the checks from the sale of the items in the pole barn, and she would cash them at the grocery store where she worked. After cashing these checks, Sister said, she gave Mother her part of the proceeds of the sale. Sister testified that she lives near Mother "right in front of the pole barn," and that she was familiar with its contents. Sister said that Son had not been to the pole barn in seven or eight years. She said that the barn contained "junk" and "scrap iron," and that "[t]here was no organization whatsoever." Sister said that it "looked like somebody had backed a trailer up in [the barn], just threw stuff in it." She said, "the shelves had rotted, and the stuff had fell off from it, and it was laying in piles." She confirmed that there were some electric motors both inside and outside of the barn and that they were "buried up in the ground."

Mickey Myers ("Myers"), who was Sister's daughter's ex-husband, testified at trial. Myers said that he had also stored some items at Mother's pole barn. Myers described some of the items in the pole barn; he said that the barn contained cotton gin equipment, wooden crates with shafts, bearings, sprockets, rollers, a table, and other items. He confirmed that there were electric motors stored in the barn, and he assumed they belonged to Son. Myers said that, after Mother hired Holland to haul away the items in the pole barn, Sister called him and told him that he needed to go to the barn and show Holland what belonged to him. He said that he knew that some of the property in the barn belonged to Son, but he understood that Mother and Sister thought that Son had abandoned the property. Myers said that he had been storing his own items in the pole barn for seven years, going to the barn once or twice a week, and he never saw Son while he was there.

Jim Hobbs ("Grandson"), Son's son and Mother's grandson, testified on behalf of his father. Grandson recalled that the pole barn was built when he was young, and testified that he knew that his father stored items in it. Grandson said that Son stored "hundreds of items, some of it small, some of it was big." He described containers with pulleys, bushings, bearings, shelving, hydraulic cylinders, hoses, cotton gin equipment, welding tables, stamping presses, bolts, special gauges, electrical equipment, and electric motors. Grandson testified that he was in the business of rebuilding and reselling machinery, and said that on several occasions he went to the pole barn to get a part that was needed to rebuild machinery on which he was working. Grandson said that Mother and Sister knew that the property in the barn belonged to Son.

Son testified on his own behalf. Son described his family as "totally dysfunctional," saying that he had no relationship with them "since I've been cheated."[2] Son said that his income was

---

[2] Son's testimony referred repeatedly to his disagreement with the trial court's previous ruling that the pole barn and the real property on which it was located belonged to Mother, prompting the following exchange:

Q:      Have you had use of that pole barn?
SON:    Oh, yes, sir.
Q:      Has that use been uninterrupted?
SON:    It was mine up until the day the Court said that I couldn't have it, that I couldn't
        have the deed to my farm.

(continued...)

derived from buying predominantly oil seed extraction equipment and rebuilding it. He stated that, in 1987, he paid for the pole barn and built it to store a stack wagon. Son said that he had been collecting property in the barn from 1995 through 1999, and that some things had been there for as long as seven years. Son indicated that a large portion of the property stored in the barn was from a machine shop he had purchased at an auction, but that a majority of the parts were purchased as new parts. He said the property included crates of pulleys, large bearings, sprockets, and some hydraulic parts. There was also a small hydraulic press with a table, soft cylinders, brush cylinders, four electric motors, blast wheels, and several other items. Son asserted that the motors "were new motors," and that they had been put in the barn in 1999. Son made a list of the property that had been stored in the barn before Mother had Holland clean it out. When asked the value of that property, Son used the cost of purchasing new equipment to replace the items that were sold. He arrived at a total value of $22,039.48 for the items.

On cross-examination, Son was asked what he had paid for the property taken, and he responded, "There would be no way to tell you, because it was accumulated over the years." He admitted, however, that he did not pay full price for the items. When asked the actual value of the items sold, Son responded, "I have no idea." He claimed that the motors that were sold were new, and that they were not affected by sitting on the ground in the pole barn for several years.

At the conclusion of the trial, the trial court dismissed the claim against Sister, and then took the remaining issues under advisement. On May 25, 2004, the trial court entered a memorandum opinion and order, concluding that Mother and Holland converted Son's property by removing it from the pole barn and disposing of it without his consent. Although Son sought the replacement value of the converted property as if it were new, which he alleged was over $20,000, the trial court determined that the proper measure of damages was the value of the property at the time of conversion. The trial court observed, however, that Son offered no evidence of the property's actual value at the time of the conversion, and that he in fact admitted that he had "no idea" of the actual value. In light of this, the trial court concluded that Son was entitled only to the amount of money

[2](...continued)
Q:      All right.
        THE COURT: You know, I'm getting a little weary of this. And you may not like,
        Mr. Hobbs, what the Court's decision was, but it was the Court's decision.
SON:    Oh, yes, sir.
Q:      I don't - -
        THE COURT: Now, I'm detecting some sarcasm in that, and I'm getting a little
        concerned about it, so –
SON:    No, sir, I didn't mean it that way.
        THE COURT: Well, that's the way I'm taking it. So let's move on, and let's get to
        the meat of this issue.

the defendants received as the property's salvage value, or $657.05. From that order, Son now appeals, challenging the amount of damages awarded.[3]

The determination of the appropriate amount of damages is a question of fact, which we review *de novo*, presuming the trial court's finding to be correct unless the evidence preponderates otherwise. **Charles v. Latham**, No. E2003-00852-COA-R3-CV, 2004 WL 1898261, at *4 (Tenn. Ct. App. Aug. 25, 2004); Tenn. R. App. P. 13(d). The proper measure of damages, however, is a question of law, which is reviewed *de novo*, with no presumption of correctness. **Charles**, 2004 WL 1898261, at *4.

The trial court correctly held that, generally, the proper measure of damages in a conversion case "is the value of the property converted at the time and place of conversion, with interest." **Lance Prods., Inc. v. Commerce Union Bank**, 764 S.W.2d 207, 213 (Tenn. Ct. App. 1988); *see* **Caldwell v. Canada Trace, Inc.**, W2003-00264-COA-R3-CV, 2004 WL 1459418, at *7 (Tenn. Ct. App. June 28, 2004) (quoting **Lance Prods.**, 764 S.W.2d at 213); *see also* **Jack Strader Tire Co. v. Manufacturers Acceptance Corp.**, 429 S.W.2d 428, 430 (Tenn. 1968). In this case, much evidence was submitted by both the plaintiff and the defendants describing the condition of the converted property when it was sold. Son, however, submitted no proof as to the actual value of the property when it was sold. When asked directly about the actual value of the converted property at the time of sale, Son candidly admitted that he had "no idea," and said that there would be no way to estimate that value. In the absence of competent proof of actual value at the time of the conversion, the trial court concluded that Son could recover only the money actually paid to the defendants as the salvage value of the items converted.

From our review of the record, we see no error in the trial court's conclusion that there is a complete lack of evidence regarding the actual value of the property converted. Sufficient evidence supports the trial court's implicit finding that the property was not in new condition when it was converted, and that, therefore, the cost of replacing the property with new items is not the appropriate measure of the actual value of the converted property. Son did not attempt to estimate the value of the property when it was sold, nor could he recall what he had paid for most of the items because they had been accumulated over a period of several years. Where actual value at the time of conversion is not shown by adequate proof, Son may recover only what the defendants received from the sale of the converted property. *See* **Porter v. Porter**, No. 01A01-9412-PB-00577, 1995 WL 262094, at *4 (Tenn. Ct. App. May 5, 1995) (reducing damages to a nominal amount because the plaintiff did not prove actual value); **Maddox v. Herndon**, 1989 WL 98065, at *3 (Aug. 23, 1989) (finding that, because there was no evidence regarding the value of the converted property at the time of conversion, the plaintiff did not prove damages). Therefore, in the instant case, the trial court was fully justified in using the salvage value as the measure of damages, because it was the only evidence submitted at trial regarding the value of the property converted. Accordingly, we affirm the trial court's award to Son of $657.05 in damages for the property converted.

---

[3]Neither Mother nor Holland dispute that a conversion took place. Therefore, the only issue on appeal relates to the amount of damages to which Son is entitled.

The decision of the trial court is affirmed.  Costs on appeal are to be taxed to Appellant James Robert (Bo) Hobbs, and his surety, for which execution may issue, if necessary.


_____

HOLLY M. KIRBY, JUDGE